DRAUGHON vs FRENCH's adm'or.

*As to bills in Chancery, filed to compel distribution of an estate.*
*As to* remitter *and* retainer, *as applicable to the case of administrators.*
*Practice in Chancery.*
*As to administration, in right of marriage.*

1. A is in the possession of slaves, in which he has a life-estate—the reversion to B—B dying, C, his widow, and another, jointly take administration of his estate ; and C, after the death of her co-administrator, intermarries with D. A and C possess themselves of the estate of B ; and afterwards, A dies, and D takes administration on his estate, jointly with another, who afterwards dies, leaving D sole administrator. D and C being husband and wife, take possession of the slaves, in whom A had a life estate, and B the reversion. On a bill filed by B's distributees, it was holden,

First—that the possession of the slaves should be considered as held under the administration of B's estate ; and that admitting D and C to have taken possession of them, as part of the estate of A, yet in equity, they would be held to be remitted to the title of B ; and that they were accountable to the distributees of B, and could not allege a tortious conversion, to evade the distribution.

Secondly—That as A, in his life-time, had possessed himself of a part of the estate of B, and was accountable in his lifetime to the administrators of B, for the same ; and the two administrations, after the death of A, being vested in the same person, the latter would be held, in equity, to have retained out of the estate of A, what was due to the estate of B, and was accountable, in equity, to the distributees of B, on the ground, that there was no remedy, at law, as long as the administrations of A's and B's estates were joined in the same person ; and that as the same person had possession of both

estates, he would be presumed to have retained, out of A's estate, what was due to the estate of B, whether it existed as a debt, or unliquidated damages.

Thirdly—That while the equities of the bill might be enforced against D, administrator, in right of his wife C, of B's estate— yet it did not follow, that D, as the administrator of A, was released, or that there was no equity against him: but as the bill sought to establish the liability of the estate of A, and not alone to call on A's administrator, as a trustee, to distribute the effects, it was necessary to make A's administrator a party.

Fourthly—That the bill being filed to effect distribution of B's estate, and no liability being sought to be enforced against it, there was no necessity, to make the administrator *de bonis non,* of B's estate, a party.

2. A bill of revivor, or other bill, ancillary to a main cause before a Court of Chancery, can not be dismissed by itself, under the fourth rule, regulating Chancery practice.

3. The representative of an administrator, is liable, directly to a creditor or distributee, for assets of an estate, wasted or converted by him.

4. One who is an administrator of an estate, in right of his wife, does not have his character so changed by her decease, as to render it necessary to revive proceedings in equity (commenced in her life-time against both,) by a supplemental bill, charging him as executor *de son tort,* of such estate.

In error to a decree of the Circuit Court of Monroe County, exercising Chancery jurisdiction.

This was the case of a bill in equity, filed in the Circuit Court of Monroe County, in February eighteen hundred and twenty-seven, by James H. Draughon and Jane Edwards, against Lardner C. French and Mary, his wife.

The bill alleged, that Magnus Draughon of Monroe County, died on the eighth day of September, eighteen hundred and twenty, intestate, leaving his widow, Mary Draughon, James H. Draughon, Robert

4P     45

H. Draughon, Miller C. Draughon, and Jane Edwards, his brothers and sisters, entitled to distributive shares of his estate—he dying without issue.

That administration on his estate, on the sixth day of February, eighteen hundred and twenty-one, was committed, by the competent jurisdiction of Monroe County, to the said Mary Draughon and Robert H. Draughon, who took possession of the estate of intestate, returned inventories, and sold all the personal property, except the slaves, and certain articles, specified in the inventory, which were taken by the said administrators, at the appraised value, in conformity with an agreement between the parties interested in said estate; and the slaves were distributed to those entitled to receive them.

It was charged, that no account of the property sold, had been returned to the County Court. That after the inventory, appraisement and sale, there yet remained a large amount of money due the estate, from various persons residing in North Carolina—in reference to which, it was agreed between the administrator and administratrix, that the said administrator should take the receipts for the evidences of said debts, and proceed to North Carolina, collect and settle the same. That the evidence of those debts was permitted to remain with the administratrix, who was charged to have violated her agreement about the same, and to have permitted her father, Benjamin Locke, to take possession of them, and to have authorised him to proceed to North Carolina, and there take administration on the estate of the intestate, and collect the debts due there; and for this purpose, she signed a relinquishment of

her right to the administration there, to the said Locke, who procured administration to be granted to him.   An inventory of these debts, amounting to two thousand seven hundred and sixteen dollars and forty-four cents, was appended.

That application was repeatedly made, by said administrator, to his co-administratrix, to account and settle for these notes, so in the possession of said Locke, with her consent and approbation—which was constantly refused.   That Robert H. Draughon died on the ninth of September, 1822, testate; and that complainant, James H. Draughon, duly proved his will, as executor, and received letters testamentary thereon.   That shortly afterwards, he applied to the said administratrix, to account for the said debts, and for the property sold, as before stated, and remaining unaccounted for—which she refused; and shortly afterwards intermarried with Lardner C. French, who also refused an application to come to any account.

And the bill charged, that the said Mary and Benjamin Locke combined together, to defraud the heirs of Magnus Draughon, of the undivided portion of his estate; and, in order to enable Locke to consummate this object, the said Mary signed the relinquishment of her right to administer.

That Benjamin Locke, in eighteen hundred and twenty-six, departed this life intestate, and letters of administration, on his estate, were granted to defendant, French, and one William J. Moore, who died in the month of February, eighteen hundred and twenty-seven; and that Lardner C. French was, at the filing of the bill, the sole administrator of Lock.

That Locke had a life-estate, in slaves, named Ben, Sam, Will, and Job; and, on his death, the same became the *bona fide* right and property of the said estate of Magnus Draughon, as would appear by a bill of sale, a copy of which was exhibited—by which it appeared, that in eighteen hundred and twelve, for a valuable consideration, Locke sold the said slaves to Magnus Draughon, reserving to himself the right to retain possession, and use the same during his life.

That the said Locke, by another bill of sale, a copy of which was exhibited, in eighteen hundred and seventeen, sold eight other slaves, named Jenny, Clarresa, Charles, Cloe, Amy, Prince, little Sam and Juba, to Magnus Draughon, for a valuable consideration; and that the said Locke was, at the time he died, in possession of two of the same, Amy and Juba, to which the estate of Magnus Draughon was entitled, That after the death of Magnus Draughon, all the papers, touching the business or property of the estate, were permitted to remain with the said defendant, Mary—among which papers were the bills of sale of the slaves aforesaid. That after administration on the estate of Locke was committed to French and Moore, Moore was notified, that the two last named slaves belonged to the estate of Draughon.

The bill further charged, in confirmation of the title of Draughon to all these slaves, that Locke admitted, in his last sickness, that they belonged to Draughon's estate.

All these slaves were charged to be in the possession of defendant, French; and that he refused to deliver up or account for the same, as the property of

the estate of Draughon. That after the death of Magnus Draughon, Locke sold to one James Kidd, a negro slave, named Anthony, which belonged to the estate of said Draughon.

The bill prayed an account of the estate of Magnus Draughon, so far as the defendants, or either of them, then had or may have had, the control of the same.—That the defendants might account for the notes, bonds, &c., which were placed in the hands of Locke, with the assent of defendant, Mary.

That the estate of Locke, in the hands of French, might be decreed to pay the amount of such bonds and notes. That the negro slaves, Amy, Juba and Anthony, might be decreed the property of the estate of Magnus Draughon, and hire for the same, since his death. That the slaves, Ben, Sam, Will, and Job, be decreed to be the joint property of defendant, Mary, and the complainants, and that the defendant, French, as the administrator of Locke, might be decreed to pay a reasonable hire for the same, until he should deliver them to be divided, as the law directed; and concluded with a prayer of other and further relief, as the equity of the case required.

At March term, eighteen hundred and twenty-seven, the defendants having been served with process of *subpœna*, appeared, and the bill was answered October term, eighteen hundred and twenty-seven. The cause was continued under orders to take testimony, until March term, eighteen hundred and thirty, when a supplemental bill was filed, suggesting that since the last continuance of this cause, Mary French, the sole surviving administratrix of Magnus Draughon, had departed this life, and that there was then no

administrator on the said estate : that all the proper-
ty and effects, together with the evidences of debt
due the estate of Magnus Draughon, passed into the
hands of Lardner C. French, who then had posses-
sion of the same : that no administration *de bonis
non*, of the said Magnus had been granted ; and
prayed that the suit might revive ; and that the legal
representatives of the said Mary, when known, might
be made parties.

This supplemental bill further stated, that all the
property of the said Mary, and all the estate and ef-
fects of the estate of Magnus Draughon, at her death,
passed to the hands of French.—And further prayed,
that so far as the estate of the said Magnus Draugh-
on was concerned, the suit might revive against the
said Lardner, as the *administrator of his own wrong;*
and that he might be held accountable, &c. An order
was also prayed, commanding French to enter into
bond, conditioned that certain property and effects,
specified in an exhibit attached to the bill, should be
forthcoming to abide the final decree ; and that
French might have forthcoming, to answer a decree
of the Court, a sufficiency of the estate of Magnus
Draughon, and of the estate of Locke, to answer
and satisfy complainant's demands, as the same
might be ascertained on a final hearing.

This order, so far as related to the estate of
Draughon, was granted by an interlocutory decree—
process of attachment issued, and on the sixth Au-
gust, eighteen hundred and thirty, French executed
a bond under, though not in conformity with the in-
terlocutory decree.

At October term, eighteen hundred and thirty,

Benjamin Hunt, administrator of Magnus Draughon, was made a party, on motion.    At October term, eighteen hundred and thirty-one, French filed a plea in the cause, protesting against the continuance of the suit, and insisting, that the same had been abated, and that he ought not to be precluded from insisting on the abatement and discontinuance ; and prayed judgment of the said bill of complaint, because one Benjamin Lansdale, since the last continuance of the cause, had filed his bill of complaint in the Circuit Court of Dallas County, alleging, among other things, that Benjamin Locke, before his death, made his will and testament, duly published and executed, and praying that the same should be established; and that the said Lansdale, by his said bill of complaint, had charged the said Lardner, as administrator of Locke, as aforesaid, and made him a party defendant to the said bill of complaint, which said bill remained wholly undetermined ; wherefore the said French prayed the judgment of the Court, if the Court would proceed further.

What action, if any, was had by the Court, on this plea, so peculiar in its character, did not appear.

At March term, eighteen hundred and thirty-two, the complainants had leave to amend their bill, by making George L. Medlock, sheriff of Monroe, a party : and the defendant, French, moved to dismiss the supplemental bill against him, which was taken under advisement, and a decree was rendered in vacation, as of that term, dismissing the bill, for want of prosecution, under the authority of the fourth rule of this Court, regulating the practice in Chancery.

On the eighteenth July, eighteen hundred and

thirty-two the complainants filed a bill of revivor, setting forth that G. L. Medlock, sheriff of Monroe County, had been appointed administrator of Magnus Draughon, in the place of Mary French, praying that he might be made a party defendant, and that the suit might revive. Process of *subpœna* directed to the coronor, was issued on this bill, of which a copy was handed to Medlock, by the complainants' counsel, but no service appeared to have been made by the coronor.

At the October term, eighteen hundred and thirty-two, the presiding judge having been of counsel, no orders were made.

At March term, eighteen hundred and thirty-three, the bill of revivor was dismissed for want of prosecution, under the fourth rule of this Court, for the regulation of Chancery practice, and a formal decree as to all the parties, was rendered. This decree assumed, that so much of the bill of complaint as sought to charge French as administrator, in right of his wife, of Magnus Draughon, deceased, and against Mary French, administratrix of Magnus Draughon, was abated, by the death of the said Mary, before October term, eighteen hundred and thirty, and had never been revived—and proceeded to dismiss the only remaining part of the bill, for want of equity—that is, against French, as the administrator of Locke.

Argued by *Gibbons*, for the plaintiff in error.
*Clarke*, contra.

GOLDTHWAITE, J.—This cause has been re-

moved to this Court by writ of error, and it is now assigned for cause of reversal—

1st. That the bill in which Lardner C. French was charged as administrator of his own wrong, should not have been dismissed.

2nd. That the bill of revivor against Medlock, as the administrator of Magnus Draughon, should not have been dismissed.

3rd. That the final decree, dismissing the bill, as to French, administrator of Locke, should not have been made.

Since the cause has been removed to this Court, one of the complainants, Jane Edwards, has died; and her personal representatives not having been made parties, the suit must abate, in so far as she is concerned. The death of the defendant, French, has also been suggested, and his personal representatives have been made parties.

It will much facilitate the proper understanding of the cause, if the bill shall be so analyzed, as to present the distinct equities which arise from the facts stated in the original bill, as between the complainants and the defendants, in their different representative characters.

It seeks to charge Mary French and her husband, as the administratrix and administrator of the estate of Magnus Draughon, for such portion of the estate as has not been distributed. This consists of,

1st. The personal estate, sold and unaccounted for.

2nd. The debts due Draughon, in North Carolina, which it charges they are accountable for, because

4P.                46

Mrs. Draughon permitted Locke to obtain possession of them, by voluntarily relinquishing to him the right to administer on such part of her husband's estate as was in North Carolina.

It seeks to charge the defendant, French, as the administrator of Locke, with—

1st. The debts due to Draughon, in North Carolina, which were, or which could have been collected under the administration, in North Carolina.

2nd. For the several slaves, which were in the possession of Locke when he died, which belonged to the estate of Magnus Draughon, but which are charged to have been taken by French, under color of his administration on Locke's estate.

3d. For the hire of the two slaves, Amy and Juba, from the death of Draughon; and hire for the others from the death of Locke.

4th. For the value of the slave Anthony, which is charged to have belonged to the estate of Draughon, and was sold after his death, by Locke.

It should be constantly remembered, throughout the examination of this case, that the administration on Draughon's estate, and the administration on Lock's estate, were in the charge of the same individual, subsequent to the death of Moore. French, administrator of Draughon, in right of his wife, had as complete control over it, as French, administrator in his own right, could have over the estate of Locke. Was one of the estates indebted to the other, or had one intestate taken and converted to his own use, the property of the other, no suit or action could be maintained, so long as the administrations were united in the same person. French and wife, as admi-

nistrators of Draughon, could not have sued French, administrator of Locke. And the rule would have obtained, if French, before the death of his intestates, had taken and converted their property to his use.

Without adverting to this distinctive feature in the bill, it might be thought there was no equity in it, so far as the relief is sought for the taking or converting the slaves; and perhaps, also, so far as relief is sought against French, as the administrator of Locke, for the money collected on the administration in North Carolina.

The bill seems to have been framed with a view to the particular equities, which have been before stated; but the only appropriate prayer for relief against French, as the administrator of Locke, seems to the Court to be—

1st. For the amount of the debts collected in North Carolina, on the administration *there*, supposing it not to be ancillary to the administration *here*, and that a payment by Locke, to Mrs. French, would not discharge him from his liabilities to account *directly*, to the distributees of Draughon's estate.

2nd. For the value of the slave Anthony : and

3rd. For the hire of the two slaves, Amy and Juba, from the death of Draughon, to the time of the death of Locke.

In relation to the slaves themselves, and also the other slaves, in which it is said Locke had a life estate, they never could, on the facts stated in the bill, be made the subject of a charge against Locke's estate, *unless Locke had converted them*, in his life-time. French was not, nor could he be in possession of them,

as Locke's administrator.—It is alleged, Locke had no title, and that they belonged to the estate of Draughon—consequently, when French came to the possession of them, it was as a tort-feasor, or by virtue of the title vested with him, as Draughon's administrator; and, it seems, he would not be permitted to allege against the distributees of Draughon, that he took them, as a wrong-doer. If they did not belong to Locke's estate, he would have had no right to take them, except they did belong to the estate of Draughon, which estate he also represented.

An analogy is believed to exist between this case and that of a remitter, which is defined to be, "where he who has the true property in lands, but is out of possession thereof, and hath no right to enter, without recovering possession by action, has afterwards the free-hold cast on him by some subsequent, and of course defective title—in this case he is remitted, or sent back by operation of law, to his ancient and better title."[*]

3Black.C 49.

Now here, if the facts stated in the bill be true, French having the possession cast on him, either by his own act, or by operation of law, is remitted to his title, under the estate of Draughon.

If a tort-feasor died in the possession of slaves, to which he had not acquired a title by possession, and administration on his estate should be committed to the true owner of the slaves, would he not be remitted to his better title?

And in relation to all the other matters, charging French, as administrator of Locke, with indebtedness and accountability to the estate of Draughon, we

think the doctrine of retainer, applies with much force.

It is true, that all the authorities in reference to retainer, speak of "debts;" but the reason of the rule, as laid down in Toller on Ex. 295, is this.— "This remedy arises from mere operation of law, on the ground, that it were absurd and incongruous, that he should sue himself, or that the same hand should at once pay and receive the same debt; and therefore, he may appropriate a sufficient part of the assets, in satisfaction of his own demand—otherwise he would be exposed to the greatest hardship: for, since the creditor who first commences a suit is entitled to a preference in payment, and the executor can commence no suit, he must, in the case of an insolvent estate, necessarily lose his debt, unless he has the right of retaining."

This rule applies with equal force, to a demand which is unliquidated in its character. There seems to be no sufficient reason which can be urged, why the executor or administrator should not retain, in all cases, when the action would survive. Certainly the damages on an action of covenant, or assumpsit, for the non-performance of a contract, are not higher in a moral standard, than those in detinue or trover.

If A be indebted in a bond to B, and die, having appointed B his executor, who, after having intermeddled with the goods, *and before probate*, also dies, although before his death he did not elect in what particular effects he would have the property altered, [*3P.Wms. 183, '84, & note B.] yet his executor shall have the same power of retaining.[*] [†Tol.on Ex 195.] And the right to retain exists in equity, as well as at law[†] [1 P.Wms. 296.]

This reasoning, if correct, establishes, that all the equities of this bill might be enforced against French, administrator in right of his wife, of Magnus Draughon's estate; but we do not think it is a consequence, that French, as the administrator of Locke, would be released, or that there is no equity in the bill against him in that right. Independent of its presenting the case of two funds, against which the distributees of Draughon might elect to proceed, or in case of the deficiency of the one, to resort to the other, it was essential to make the administrator of Locke a party to the bill—inasmuch as the bill seeks to establish the liability of the estate, and not merely to call on the administrator as a trustee to distribute the effects.

In this respect, the bill presents a remarkable difference in the action sought against the individuals in their several representative capacities. It calls on the representatives of Draughon, as trustees, to compel a distribution; but as against the representatives of Locke, it not only does this, but also to establish a liability.

Having arrived at the conclusion that there is equity in the bill, against French, as the administrator of Locke, we might dismiss the further consideration of the case, if it did not involve some questions, which are material to the cause as it now stands.

It seems to have been considered necessary, that the administrator *de bonis non*, of Magnus Draughon, should be made a party to this cause. If such was the fact, it was error to dismiss the bill against Medlock—because, being a necessary party, if sent out of

Court, then he must have been brought in, before a final decree could be pronounced. Our construction of the fourth rule of this Court, for the regulation of Chancery practice, is, that a bill of revivor, or any other bill which is ancillary to the main cause before the Court, cannot be dismissed by itself, under this rule. When *the bill* is dismissed for want of prosecution, it should be the main bill, and the whole cause should be at an end.

But this particular bill was rightfully dismissed, though not for a right reason. There was no necessity for an administrator *de bonis non* of Draughon, to be before the Court, under the facts then or since exhibited. The bill was filed against administrators to distribute an estate ; and inasmuch as no liability was to be enforced against *the estate*, as such, it needed no representatives to defend its rights. The administrator, like any other trustee, was, before the Court, called on to account for a trust fund.

This Court, in the case of *Chamberlain, adm'r vs. Bates, adm'r*,* has decided, that " an administrator, *de bonis non*, cannot maintain an action at law, against the representatives of a former administrator, to recover money received by the latter in the course of a partial administration, and not accounted for or paid over ; and as a consequence, it must result that the administrator of an administrator, is liable to account directly to the creditor or distributee.

*2 Porter, 550.

The case of *Coleman v. McMurdo & Prentis*,† is an authority to the same effect, and settles, conclusively, that the representative of an administrator may be sued directly, by the creditor or distributee, where the assets have been wasted or converted by him.

†5 Rand.51

The only remaining point to be examined, is the dismissal of the supplemental bill, seeking to charge French, as administrator *de son tort*, of Draughon, after the death of Mrs. French.

It is presumed that the expression, *administrator*, *de son tort*, was introduced into this bill, by mistake, and that *executor, de son tort*, was intended. It is difficult to conceive how an administrator in right of his wife, on her decease, could have his character modified or changed. It may be sufficient to say, that this proceeding was wholly unnecessary, when viewed in any other light, than suggesting to the Court below the death of one of the defendants.— There was, therefore, no error in dismissing this supplemental bill.

It may be necessary to add, that previous to a final decree in the Court below, all the distributees should be made parties, or reason shewn why the same cannot be done.

The decree of the Circuit Court, dismissing the bill as to Medlock, must be affirmed; and the final decree dismissing the bill as to French, as administrator of Locke, must be reversed, and the cause remanded to the Circuit Court, with directions to proceed in the cause, and if necessary, to amend the bill, and make new parties; which we conceive to be necessary, so far as the other distributees of the estate of Magnus Draughon are interested; and as the bill seeks to establish a liability against the estate of Locke, as well as to compel a distribution against the defendant French, for a fund already in his hands, it is considered that the administrator *de bonis non* of Locke, may be a necessary party to such parts of

DRAUGHON VS FRENCH'S ADM'R.

the bill as seek to establish a disputed liability of the estate for the slave Anthony, and the hire of the slaves Amy and Juba, from the death of Draughon to the death of Locke.

The costs must be decreed against the representatives of the defendant French, so far as the judgment is reversed, and in favor of Medlock, so far as affirmed.

HOPKINS, C. J. not sitting.